This case was remanded for a new trial in Custom Truck Sales Service, a division of Alley-Cassetty Coal, Inc. v. Osborn,507 So.2d 424 (Ala. 1987). After the second trial, the plaintiff, Johnny M. Osborn, *Page 244 
appeals from a judgment, based on a jury verdict, in favor of the defendants, Custom Truck Sales Service, a division of Alley-Cassetty Coal, Inc. ("Custom Truck"). We affirm.
The issues are (1) whether there was an implied warranty of merchantability in the sale of four used cement trucks; (2) whether the trial court erred in not charging the jury that the plaintiff could recover for willful misrepresentation, deceit, and suppression of the truth; and (3) whether the verdict of the jury was plainly and palpably wrong or manifestly unjust.
In the spring of 1982, Osborn desired to purchase four Crane Carrier model cement trucks for his ready mix concrete business in Alabama. Osborn communicated with Bill Crouch, general manager of Custom Truck, in Nashville, Tennessee. Custom Truck was a franchise dealer for Crane Carrier Corporation ("Crane Carrier"), a manufacturer of trucks in Tulsa, Oklahoma. Crouch visited Osborn's plant site, and they discussed what kind of trucks Osborn wanted. Later, Crouch contacted the Crane Carrier factory and was directed to contact Gene Henderson in Dallas, Texas, who knew where there were some used Crane Carrier trucks that Osborn might be interested in purchasing. Crouch discussed with Henderson what kind of trucks Osborn wanted, and Henderson located about 12 Crane Carrier cement trucks in Dallas, Texas. The trucks were being refurbished for Crane Carrier by a company called Mixer Southwest. Henderson told Crouch that some of the trucks had been repaired, refurbished, and repainted and that some were in the process of having such work done. Crouch notified Osborn that he had located some trucks, and Osborn sent Raymond Thompson to Dallas to inspect the trucks. Thompson, accompanied by Crouch and Henderson, inspected the steering mechanism, engine, transmission, drive lines, differential, running gear, and pinion on the trucks and selected four 1979 model trucks. At the time Thompson inspected the four trucks, one of the cabs had a coat of primer, and the other three cabs had been freshly painted. As a result, neither Thompson nor Crouch could tell whether any "new steel skins" had been put on the trucks. Thompson did not specifically inspect the trucks for rust. Upon Thompson's recommendation, Osborn placed a deposit on the four trucks. Osborn purchased the trucks through a leasing company for $40,000 each and sent some of his employees to Dallas to drive the trucks to Alabama. When the trucks arrived in Alabama, they had to have a few repairs, and for those repairs Osborn received an offset of $3,000 against the purchase price.
The trucks were put in operation by the summer of 1982, and by January 1983, the cabs of the trucks began showing extensive defects. Instead of having "new steel skins," which Osborn claims Crouch had promised would be put on the cabs, the rust-damaged areas had been repaired with "bondo," primed, and repainted. Repairing the cabs with "new steel skins" would have entailed cutting out the rust-damaged areas, welding new steel onto the area, and preparing it for painting. After the trucks were put in operation, the paint began to flake off the cabs and the bondo began to fall out; and the floorboards of the cabs began to show rust, which was so extensive in one cab that a piece of metal had to be put on the floor for the driver to rest his feet. Also, the cab doors would not open and close properly.
Osborn notified Crouch about the rust problems. Crouch said the proper repairs could be made in Nashville but would be made at Osborn's expense. Thereafter, Osborn ordered four new cabs through Custom Truck. Three cabs were delivered, but the fourth was not delivered because Osborn had refused to pay for the first three.
In December 1983, Osborn sued Custom Truck on four counts, alleging (1) misrepresentation made knowingly or recklessly or innocently; (2) breach of an implied warranty of fitness for a particular purpose; (3) breach of an implied warranty of merchantibility; and (4) breach of an express *Page 245 
warranty.[1]
The basis of this lawsuit is Osborn's allegation that Crouch promised that, to the extent that the four truck cabs had any rust, the cabs would be refurbished with "new steel skins" so as to make them practically new cabs.
Crouch testified, in part, as follows:
 "Q And what was your conversation with Mr. Henderson about these trucks?
 "A Told him we had a customer who was looking for four Crane Carrier trucks and asked him what he had and he said, 'Well, we've got ten or twelve,' and that he had some '79 models, some that he had already gone through and had everything operating on and some of them had been repainted, some of them were in the process of having work done to them and repainting,
". . . .
 "Q Did you ever talk with Mr. Henderson and find out from him whether he was going to put new steel on these particular trucks?
 "A Specifically, the — his conversation and my conversation along the lines that the conditions of the trucks was everything would be operating on them, the cabs would be in — in good, sound order, and if — right now I couldn't specifically say that he stated any rust was on them yet if it's — was rust on them, that they had been repaired. The cost of mechanical's time to straighten up any rust that was all the way — all the way through would overshadow the cost of putting in a new section of skin but it's just not practical to spend a lot of time bondoing.
 "Q Let's just look at this as a hypothetical. If these trucks had been driven into your lot in Nashville with rust spots on them, rusty places on the trucks, what would your company have done to refurbish those things?
 "A Well, it depends on what extent the rust was. If it's embedded into the steel where it wouldn't polish out then we would cut it out and then put a small section of skin there. And that's what is done commonly in the industry all the time and welded in and smoothed down.
 "Q Now, isn't this what you said was going to be done with these trucks when you talked with Johnny Osborn?
 "A I'm sure if we discussed rust, that it would be properly repaired, yes.
 "Q Well, don't you recall that you did discuss rust and that you —
"A When —
 "Q — told him that they would be using new steel in these trucks in order to cover up or to replace any rusty spots?
 "A When his man and I looked at the trucks there was obviously no rust on them. We raised the cabs to look at the floorboards. They were in good sound shape and there was — in a sense on these trucks, the question never came up.
 "Q Well, that's because they were painted and they were primed when you went out there, weren't they, Mr. Crouch?
 "A Two of them were painted and two of them had been primed, yes.
 "Q And the paint or the primer will cover up any rust spots, won't they?
 "A Yes, sir, except under the — when you raise the cab you can pretty well tell there if it's major rust of any great consequence.
"Q Well, these —
 "A Doors — the windows and doors operated fine and the telltale areas for extreme rust just did not show.
 "Q Because they were covered with paint or primer, weren't they?
 "A The trucks were primed, yes, sir. Two of them were painted.
 "Q And by this point you had already told Mr. Osborn, hadn't you, what kind *Page 246 
of condition those trucks were going to be in?
 "A Was told — that's why I wanted him to go out there because used trucks are used trucks. Used cars are used cars and you —
"Q You wanted him to go see —
"A Right.
 "Q — what the condition — that the condition was as you had told him it was going to be.
 "A The trucks would be good, sound trucks. I told him exactly what Gene Henderson told me, the trucks were good, sound, operating trucks and would have either fifty percent rubber or new recaps on the rear and it would be nothing wrong with the operation of the trucks.
 "Q Now, are you saying you do recall or you don't recall telling Mr. Osborn that any rust spots would be refurbished with new steel?
"A With new skin?
"Q New skin.
 "A If we discussed it, I would have told him that, yes, but I don't recall it coming up on these trucks.
"Q Okay.
 "A And I didn't see the trucks before they were — had gone into that shop."
Crouch, who had been in the business of selling trucks for 20 years, further testified that the standards on sales of used trucks with respect to warranties given, if any, is "as is, where is," except that, in the case of an engine overhaul, the engine is warranted up to six months.
Osborn testified, in part, as follows:
 "Q Mr. Osborn, in this case you've alleged that there's been some misrepresentation of the condition of the trucks that you bought from Custom Truck Sales. What statements were made to you that you consider to be misrepresentation?
 "A The cabs were supposed to have had new metal put on them, if there were any rust on the cab, there would be new metal put on the trucks and be put back like they were, you know, practically new truck or new cab or new trucks.
"Q And who made that representation to you?
"A Mr. Couch [sic].
"Q You say, 'Couch,' you mean Mr. Crouch?
"A Yeah.
 "Q Did he tell you or did he represent to you who would be doing the work to put these cabs in this reconditioned condition?
 "A He represented that they would be done in Texas at — they were Crane Carrier trucks — that Crane Carrier owned the trucks but they couldn't get to the trucks and they were letting a Mr. Henderson redo the trucks for them.
". . . .
 "Q Was it important to you in a material matter that the trucks be refinished with new steel skin, if there was any rust on them?
"A Yes, sir.
"Q Did it matter to you?
"A Yes, sir, it did.
"Q Why?
 "A Well, I knew if they wasn't then if it was bondoed or stuff put in the trucks it wouldn't stay in the trucks because the trucks are put into real rough places a lot of times and twisting and — with the cab — and if not, it wouldn't stay in it.
". . . .
 "Q When did Mr. Crouch talk to you and make these representations to you about the new skin on the trucks?
 "A When he came down and — and I talked to him. Was then, probably March or April — April about the truck and — and he said that he had found a truck and that they were in Texas and that they would be . . . redone and whatever needed to be done to them would be done to them at that time.
 "Q Now, did you ever have an opportunity to examine the trucks yourself prior to the time that you bought them? *Page 247 
"A No, sir, not until they came to my place.
 "Q When they did come to your place what condition were the trucks in?
"A The trucks looked good.
"Q Were they painted?
"A Yes, sir.
"Q Did you see any signs of rust?
"A Not at that time I didn't."
 I.
The trial court directed a verdict in favor of Custom Truck on the issue of whether there was an implied warranty of merchantability.
Osborn argues that there was an implied warranty of merchantability in the sale of the four used cement trucks. We disagree.
We note that other jurisdictions have adopted an implied warranty of merchantability in the sale of a used motor vehicle. However, this Court stated in Trax, Inc. v. Tidmore,331 So.2d 275, 277 (Ala. 1976):
 "The law in Alabama regarding sales of used or second-hand vehicles was stated in Kilborn v. Henderson, 37 Ala. App. 173, 65 So.2d 533 (1953): 'The general rule is that there is no implied warranty of the quality or condition of a used automobile and the rule of caveat emptor applies.' "
See also Curry Motor Co. v. Hasty, 505 So.2d 347, 350
(Ala. 1987). Therefore, we conclude that the trial court properly directed a verdict in favor of Custom Truck on this issue.
 II.
The trial court instructed the jury, inter alia, concerning the issues of reckless misrepresentation and mistaken misrepresentation. Osborn argues that the trial court erred in not giving instructions 18.01, 18.04, and 18.05 of the AlabamaPattern Jury Instruction: Civil (1974).[2]
Instruction 8.01 concerns the issue of willful misrepresentation, and it reads:
 "If you are reasonably satisfied from the evidence that defendant willfully misrepresented a material fact to the plaintiff with the intent to induce plaintiff to act thereon and plaintiff did, without knowledge of its falsity, act upon said willful misrepresentation to his injury, then defendant is guilty of legal fraud."
Instruction 18.04 concerns the issue of deceit, and it reads:
 "If you are reasonably satisfied by the evidence that the defendant deceived the plaintiff (by a willful representation of a material fact as true which he knew to be untrue) or (by the reckless representation of a material fact as true which he did not know to be false) to induce the plaintiff to act and that plaintiff did act thereon to his injury, the defendant is guilty of a deceit which is a legal fraud.
 "I further charge you that the defendant's knowledge of the falsehood is an essential element of deceit. A fraudulent or reckless representation of the facts as true which the defendant did not know to be false, if intended to deceive the plaintiff, is equivalent to a knowledge of the falsehood."
Instruction 18.05 concerns the issue of suppression of truth, and it reads:
 "If you are reasonably satisfied from the evidence that the defendant (concealed) (withheld) material facts from the plaintiff and without his knowledge of such material facts he acted to his injury, then the defendant would be guilty of a legal fraud."
We find no evidence from which the jury could have inferred that Crouch, acting as the authorized agent for Custom Truck, (1) willfully misrepresented a material fact to Osborn; (2) acted with knowledge of the alleged falsehood so that his actions amounted to deceit; or (3) concealed or withheld material facts from Osborn. Therefore, the instructions requested on that theory of the case were properly refused.Southern Ry. v. Clarke, 203 Ala. 248, 249, 82 So. 516, 517
(1919). *Page 248 
 III.
Finally, Osborn argues that the verdict of the jury was "not based upon substantial evidence of record." We recognize that "an appellate court will revise a jury's verdict if it is convinced by a 'preponderance of the evidence that the jury's verdict was palpably wrong and manifestly unjust.' "Tallant v. Grain Mart, Inc., 432 So.2d 1251, 1255 (Ala. 1983) (citation omitted). However, in this case, we are not so convinced.
Therefore, the judgment is due to be, and it is hereby, affirmed.
AFFIRMED.
HORNSBY, C.J., and JONES, SHORES and HOUSTON, JJ., concur.
[1] Because the complaint was filed prior to the adoption of Code 1975, § 12-21-12, the "scintilla" rule of evidence applies.
[2] Custom Truck argues that Osborn did not comply with Rule 51, A.R.Civ.P.; however, we note Osborn's objections to the trial court's ruling on §§ 18.01, 18.04, and 18.05 at pages 158-61 of the record.